2003 ND 26

**CONTINENTAL RESOURCES, INC., Petitioner,**

v.

**The Honorable Allan SCHMALENBERGER, Judge of the Bowman County District Court, Southwest Judicial District; McKennett Stenehjem Reierson Forsberg Hermanson, P.C.; Kent Reierson, Individually; James H. Bragg; J. Michael Gleason, d/b/a Gleason Land Co.; and Julie K. McKinley a/k/a/ Julie K. King, Respondents.**

No. 20020179.

Supreme Court of North Dakota.

Feb. 21, 2003.

Lawrence Bender, Pearce & Durick, Bismarck, N.D., for petitioner.

Kent A. Reierson, McKennett Stenehjem Reierson Forsberg & Hermanson, P.C., Williston, N.D., for respondents.

SANDSTROM, Justice.

[¶ 1] Continental Resources, Inc. ("Continental"), has petitioned for a writ of mandamus or a supervisory writ directing the district court to vacate its order of May 29, 2002, and directing the district court to disqualify Kent Reierson and the law firm of McKennett Stenehjem Reier-

son Forsberg & Hermanson, P.C. (collectively referred to as "Reierson"), from further representing James H. Bragg, J. Michael Gleason, doing business as Gleason Land Co., and Julie K. McKinley also known as Julie K. King, or providing successor counsel with any information or documents supplied to or utilized by Reierson's firm in previously representing Continental. We grant the petition.

I

[¶ 2] In 1999, Gleason, Patricia Ann Dragos, Valery John Kloeckner, and M.A. Kloeckner, individually and as trustee for Louise Ann Baker, sued Continental, alleging they owned minerals or held oil and gas leases in the Southwest¼ of Section 17, Township 131 North, Range 106 West, in Bowman County; all of Section 17 was established as the Rosella No. 1–17 spacing unit; Continental completed a producing oil and gas well in the spacing unit; and Continental had failed and refused to pay them sums due by virtue of their mineral interests and leases. Continental answered and counterclaimed, alleging, among other things, it has a superior lease, it is entitled to a decree of quiet title, and Gleason breached a fiduciary duty to Continental "when he used information gained while acting as Continental's agent to secure the Kloeckner Leases to the detriment of Continental."

[¶ 3] In 1999, Bragg and Gleason sued Continental, alleging that, through oil and gas leases from Larry E. White and Kathryn E. White, they owned working interests in two oil and gas wells operated by Continental in Bowman County—the "Bernadette # 1–24 located in Section 24–131–105" and the "Captain # 1–23 located in Section 23–131–105"—and that Continental has refused to pay them revenue attributable to their working interests. Continental answered, denying Bragg and Gleason own working interests in the wells. Continental counterclaimed, alleging it has a leasehold interest in the minerals in the subject lands; Bragg and Gleason were employed as independent contractors by Diamond Resources, Inc. ("Diamond"), to acquire oil and gas leases for Continental in Bowman County and through that employment learned of a title dispute between Larry and Kathryn White and Robert and Joan Thom to the subject lands; and "Bragg and Gleason willfully, wrongfully and maliciously utilized information they acquired while employed by Diamond to secure oil and gas leases for themselves on the Subject Lands."

[¶ 4] The cases were consolidated on January 12, 2001. On May 17, 2001, the trial court granted Continental's motion to amend its answer and counterclaim. Continental served an amended answer and counterclaim additionally asserting, among other things, allegations of a trade secret violation, negligent interference with prospective business advantage, breach of employee duty of loyalty, and civil conspiracy. Continental filed a third-party complaint dated August 3, 2001, against McKinley, asserting McKinley, Gleason, and Bragg used confidential information to acquire leases and mineral interests for themselves to the detriment of Continental, and asserting claims for trade secret violation, negligent interference with prospective business advantage, civil conspiracy, indemnity, and contribution.

[¶ 5] After identifying a number of tracts for which Continental had engaged Reierson to prepare title opinions and in which Bragg, Gleason, and McKinley claim to have interests, Continental demanded that Reierson withdraw from further representing Bragg, Gleason, and McKinley and forward all files related to work Reierson performed for Continental. In response, Reierson asserted he did not be-

lieve there was a conflict of interest and stated he would retain the files pending resolution of the issue by the trial court. In his response, Reierson said:

[O]n October 11, 1995, we opened file 22710, under which we began working on a drilling title opinion for a Wallman # 1–32 on Section 32–130–104, Bowman County, North Dakota. That drilling title opinion was never completed. We had completed a draft with some net revenue interests calculated....

It was not until we had received a list of wells earlier this year that I realized that Bragg and Gleason had an interest in the Wallman well. As you know, that interest was obtained long after our representation of Continental was completed and before we ever began representation of Bragg and Gleason. As you are aware, there is no apparent title dispute on the Wallman interest. Rather, the dispute centers on whether or not Bragg, Gleason and McKinley utilized confidential information or breached a fiduciary obligation in obtaining interests in the Bowman County area. Hence, the title work that we did for Continental is not substantially related to the issue presently before the court.

[¶ 6] On May 29, 2002, the trial court denied Continental's motion to disqualify Reierson from further representing Bragg, Gleason, and McKinley, explaining:

Continental's claims against Bragg, Gleason and McKinley concern whether they breached their agency, violated trade secrets, interfered with prospective advantages involving an employee's duty of loyalty and allegations of civil conspiracy. I do not find that the title work completed by Reierson was the same matter or substantially related to the issues before the Court in this litigation.

Continental petitioned for "an order, in the form of a writ of mandamus or a supervisory order directing the Respondent, district court judge," to vacate its order of May 29, 2002, and further directing the district court to disqualify Reierson from further representing Bragg, Gleason, and McKinley.

II

[¶ 7] This Court's authority to issue a supervisory writ is derived from the North Dakota Constitution, Article VI, Section 2. *Heringer v. Haskell,* 536 N.W.2d 362, 364 (N.D.1995). The power to issue a supervisory writ in the exercise of this Court's superintending control over inferior courts is discretionary and is used only to rectify errors and prevent injustice in extraordinary cases for which there is no adequate alternative remedy. *Id.* We have recognized "an order denying a motion to disqualify counsel is not immediately appealable." *Id.* If the case proceeds to judgment before presentation of the issue, any disclosure or further disclosures of confidential client information and theories will have occurred, and it will be impossible to return the parties to the status quo. *Id.* at 365. We believe this is an appropriate case in which to exercise our supervisory jurisdiction.

III

[¶ 8] Continental contends Reierson is disqualified under N.D.R. Prof. Conduct 1.9 because Reierson's continued representation of Bragg, Gleason, and McKinley in this litigation creates an appearance of impropriety.

[¶ 9] Continental has asserted, among other things: (1) In 1995 it engaged Reierson, through Diamond, to assist Continental "in the acquisition of oil and gas exploration rights by performing title work for Continental on certain properties in Bow-

man County;" (2) Diamond requested Reierson "to prepare a drilling title opinion for one of the Baloco Properties and lands within the same section on which the Wallman # 1–32 well was located;" (3) "Once again, Diamond provided Reierson's Firm with documents and other confidential information necessary to assist in preparing the drilling title opinion for the Wallman Property;" (4) While conducting the title work for Continental, Reierson had contacts with Gleason and Bragg, who were contract landmen working for Diamond and Continental on the same tracts of land on which Reierson was doing title work; (5) Continental "has identified multiple tracts in which Reierson's Firm was engaged to prepare title opinions for Continental and in which Bragg, Gleason and McKinley now have acquired or claim to own interests;" and (6) "Subsequent thereto, Reierson's Firm took on the representation of Bragg, Gleason and McKinley in the suit which is currently pending before the district court. Now, Reierson's firm is assisting admitted competitors of Continental to acquire these same oil and gas exploration rights in Bowman and Slope Counties."

[¶ 10] Reierson contends his title work for Continental and the present litigation were not the same matter or substantially related and his title work for Continental was not materially adverse to Continental's interests in this litigation:

> After reviewing the matter, it was determined by the law firm that having done title work in 1995 concerning the Wallman # 1–32 was not the "same matter" nor "substantially related matter" to the allegations of a breach of a fiduciary obligation by Bragg, Gleason and McKinley as being alleged by Continental Resources. Furthermore, it was determined that the interest in which Reierson did the title work was not materially adverse to the defense of

Continental's counterclaim against Bragg and Gleason. In addition, it was not material, as the Wallman # 1–32 interest owned by Bragg, McKinley and Gleason was a very small, almost insignificant, interest compared to the claims being made in this litigation.

## IV

[¶ 11] This case involves the "delicate and sometimes difficult task of balancing competing interests: the individual right to be represented by counsel of one's choice, each party's right to be free from the risk of even inadvertent disclosure of confidential information, and the public's interest in the scrupulous administration of justice." *Brown v. Eighth Judicial Dist. Court,* 116 Nev. 1200, 14 P.3d 1266, 1269–70 (2000).

[¶ 12] "Loyalty is an essential element in the lawyer's relationship to a client." Comment, N.D.R. Prof. Conduct 1.7. "The duty of confidentiality continues after the client-lawyer relationship has terminated." Comment, N.D.R. Prof. Conduct 1.6. "An integral purpose of the rule of confidentiality is to encourage clients to fully and freely disclose to their attorneys all facts pertinent to their cause with absolute assurance that such information will not be used to their disadvantage." *Damron v. Herzog,* 67 F.3d 211, 215 (9th Cir. 1995). " 'Clients must feel free to share confidences with their lawyers. This will not occur if we permit lawyers to be today's confidants and tomorrow's adversaries.' " *Clinard v. Blackwood,* 46 S.W.3d 177, 188 (Tenn.2001) (quoting *Penn Mut. Life Ins. Co. v. Cleveland Mall Assocs.,* 841 F.Supp. 815, 818 (E.D.Tenn.1993)). As the court said in *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266–67 (7th Cir.1983) (citations omitted):

For rather obvious reasons a lawyer is prohibited from using confidential information that he has obtained from a client against that client on behalf of another one. But this prohibition has not seemed enough by itself to make clients feel secure about reposing confidences in lawyers, so a further prohibition has evolved: a lawyer may not represent an adversary of his former client if the subject matter of the two representations is "substantially related," which means: if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second. It is irrelevant whether he actually obtained such information and used it against his former client, or whether—if the lawyer is a firm rather than an individual practitioner—different people in the firm handled the two matters and scrupulously avoided discussing them.

■ [¶ 13] Confidentiality is promoted through N.D.R. Prof. Conduct 1.9, which provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same matter in which that person's interests are materially adverse to the interests of the former client; or

(b) Represent another person in a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(c) Use information relating to the representation to the disadvantage of the former client in the same or a substantially related matter except as Rule 1.6 would require or permit with respect to a client.

Thus, a lawyer may not represent another client in the same matter in which that client's interests are materially adverse to the interest of the former client, or, without a former client's consent, represent another client in a substantially related matter in which that client's interests are materially adverse to the interests of the former client.

■ [¶ 14] In *Heringer v. Haskell*, 536 N.W.2d 362, 365 (N.D.1995), we said that in determining whether a law firm is disqualified under N.D.R. Prof. Conduct 1.10(c), "the firm whose disqualification is sought bears the burden of proof." We also said "[a]ny doubt must be resolved in favor of disqualification." *Heringer*, at 365. Those principles are appropriate as well in considering disqualification under Rule 1.9. *See Annotated Model Rules of Prof. Conduct* Rule 1.9, p. 153 (3d ed. 1996) ("Close questions are generally resolved against permitting the subsequent representation.").

■ [¶ 15] The substantial relationship test presumes a lawyer acquired confidential information from a former client if the current representation of a client whose interests are adverse to those of the former client is the same as or substantially related to the former representation. ABA/BNA, *Lawyers' Manual on Professional Conduct* 51:201 (2002). "The test does not require a detailing of the confidences allegedly transmitted, nor must confidences actually have passed between the former client and the lawyer." *Annotated Model Rules of Prof. Conduct* Rule 1.9, p. 153 (3d ed.1996).

[¶ 16] Without asserting he received no confidential information in his earlier representation of Continental, Reierson asserts he "did not disclose any information to the Plaintiffs." However, as the court said in *Damron v. Herzog*, 67 F.3d 211, 215 (9th Cir.1995), "when an attorney engages in a conflict of interest on the same matter, he or she is in a position to act on the confidential information learned from

the relationship with the first client, whether or not that information is actually disclosed or acted upon in advising the new client."

[¶ 17] The trial court tersely explained its denial of Continental's motion to disqualify Reierson: "I do not find that the title work completed by Reierson was the same matter or substantially related to the issues before the Court in this litigation."

[¶ 18] Bragg and Gleason acquired an interest in the Wallman well after Reierson "began working on a drilling title opinion for a Wallman # 1–32" and "had completed a draft with some net revenue interests calculated." In our view, Reierson's title work for Continental on the Wallman property and the claims involving the Wallman property in the instant litigation both involve the right to proceeds from production.

[¶ 19] Continental has alleged "Gleason was employed … by Diamond to acquire or assist in acquiring oil and gas leases for the benefit of Continental in the Bowman County area" and "used the secret and confidential information he had accumulated while working for the benefit of Continental in the Bowman County area to acquire oil and gas leases from the Kloeckners for the lands at issue in the Kloeckner Action." Continental has alleged "Bragg and Gleason became aware of the title dispute between the Whites and the Thoms over the lands at issue [sections 23 and 24 in Township 131 North, Range 105 West, where the Captain # 1–32 and the Bernadette # 1–24 wells are located] in the Bragg action by virtue of being employed by Diamond to acquire or assist in acquiring leases for Continental in the Bowman County area," and "Bragg, based upon the information he and/or Gleason gained while employed by Diamond, secured two oil and gas leases from the Whites dated July 24, 1996 in

Bragg's favor covering the lands at issue in the Bragg Action." A Continental officer said in an affidavit:

5. Continental provided Mr. Kent Rei[e]rson with confidential purchaser's ownership reports for the purpose of assisting Mr. Rei[e]rson in preparing title opinions for Continental. Copies of the confidential reports given to Mr. Rei[e]rson were later discovered in Mr. Mike Gleason's files relative to lands where Mr. Gleason acquired mineral interests.

6. Continental did *not* provide the aforementioned confidential purchaser's ownership reports to Mr. Gleason or any of the other parties involved in this lawsuit other than Mr. Rei[e]rson.

In its third-party complaint against McKinley, Continental alleged, among other things, that "based upon the secret and confidential information acquired while employed with Diamond for the benefit of Continental, McKinley, Gleason and Bragg conspired to take and did take oil and gas leases and mineral interests in Bowman and Slope Counties which were located in Continental's intended buy area," including "interests that were intended to be acquired by Diamond for the benefit of Continental … in their own names for the benefit of themselves and to the detriment of Continental."

[¶ 20] To the extent that Reierson acquired confidential information in the course of doing title work for Continental that may have then been useful to Bragg, Gleason, or McKinley in their property acquisitions to the detriment of Continental, and may be useful in advocating their claims in opposition to those of Continental, the matters involved are substantially related. Bragg, Gleason, and McKinley, on the one hand, and Continental, on the other, are on opposite sides in this litigation. The interests of Bragg,

Gleason, and McKinley, who are now represented by Reierson, are, therefore, materially adverse to the interests of Continental.

[¶ 21] We conclude Reierson's title work for Continental on the Wallman property involved the same or a substantially related matter as claims involving the Wallman property in the instant litigation, his title work on other property for Continental was substantially related to the claims in the instant litigation, and the interests of Bragg, Gleason, and McKinley, who are now represented by Reierson, are materially adverse to the interests of Continental. Under N.D.R. Prof. Conduct 1.9, therefore, Reierson may not represent Bragg, Gleason, and McKinley in this matter without Continental's consent.

[¶ 22] Although the North Dakota Rules of Professional Conduct "do not use the language, the 'appearance of impropriety' standard has not been wholly abandoned in spirit." *Heringer*, 536 N.W.2d at 366. Concern "about the public's perception of the legal profession, particularly as it relates to confidentiality of client information," is a relevant consideration "when we examine and interpret the Rules." *Id.*

[¶ 23] We view a possible appearance of impropriety from the perspective of a layperson: "[B]ecause judges have a privileged understanding of the legal system, they may fail to find an appearance of impropriety where one would be found by a layperson. The existence of an appearance of impropriety should therefore be determined from the perspective of a reasonable layperson." *Clinard v. Blackwood*, 46 S.W.3d 177, 187 (Tenn. 2001) (citing *Heringer*, 536 N.W.2d at 367).

[¶ 24] We believe a layperson "would view a law firm 'switching sides' in the middle of a dispute to be highly objec-

tionable." *Heringer*, 536 N.W.2d at 367. The court in *Cardona v. General Motors Corp.*, 942 F.Supp. 968, 975 (D.N.J.1996), explained the basis for the appearance of impropriety doctrine in such cases:

At the heart of every "side-switching attorney" case is the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with the expectation that they would be disclosed to no one else. It is for this reason that the "appearance of impropriety doctrine" was adopted to protect the public, our profession, and those it serves. In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients.

In fact, "[t]he idea of a lawyer changing sides is at the heart of the prohibition" in Rule 1.9. *Annotated Model Rules of Prof. Conduct* Rule 1.9, p. 151 (3d ed.1996). Thus, to "preserve public confidence in the legal profession, and to insure the confidentiality and integrity of client information," lawyers and law firms "must not be allowed to 'switch sides' " when they have had access to the former client's file. *Heringer*, at 367. In our view, Reierson's conduct in assisting Continental to acquire oil and gas exploration rights and then representing Bragg, Gleason, and McKinley in presenting competing claims adverse to Continental's interests would reasonably be viewed by Continental, or any layperson, as switching sides.

V

[¶ 25] Exercising our supervisory authority, we direct the district court to disqualify Reierson and the law firm of McKennett Stenehjem Reierson Forsberg & Hermanson, P.C., from further representing Bragg, Gleason, and McKinley in

this litigation and to take such further steps as are necessary to assure that confidential information is not relayed to subsequent counsel for Bragg, Gleason, and McKinley.

[¶ 26] GERALD W. VANDE WALLE, C.J., BRUCE B. HASKELL, D.J., WILLIAM A. NEUMANN, and CAROL RONNING KAPSNER, JJ., concur.

[¶ 27] The Honorable BRUCE B. HASKELL, D.J., sitting in place of MARING, J., disqualified.