2006 ND 228
In the Matter of the Disciplinary Action Against James R. Bullis, a Member of the Bar of the State of North Dakota Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner
v.
James R. Bullis, Respondent.
No. 20060132
Supreme Court of North Dakota.
Decided November 13, 2006
Brent J. Edison, Assistant Disciplinary Counsel, P.O. Box 2297, Bismarck, N.D. 58502-2297, for petitioner.
Ronald H. McLean (argued) and Joseph A. Wetch, Jr., (on brief), Serkland Law Firm, P.O. Box 6017, Fargo, N.D. 58108-6017, for respondent.
Per Curiam.
PER CURIAM.
[¶1] James R. Bullis challenges a Disciplinary Board hearing panel report finding that he violated N.D.R. Prof. Conduct 1.7(a), (b), and (c), and 1.8(a) and (b), and recommending that Bullis be reprimanded, complete six hours of non-self-study continuing legal education ("CLE") in the area of conflicts of interest within the next two years in addition to the mandatory CLE requirements, and pay the costs and expenses of the disciplinary proceeding in the amount of $5,181.15. We conclude there is clear and convincing evidence Bullis violated N.D.R. Prof. Conduct 1.7(a), (b), and (c), and 1.8(a) and (b). We order that Bullis be suspended from the practice of law for 90 days, rather than be reprimanded, and adopt the other sanctions recommended by the panel.

I
[¶2] Bullis was admitted to practice law in North Dakota on October 1, 1992. Since then, he has worked in law offices located in Fargo and Moorhead, Minnesota. In 1997, Bullis began acting as Michael Volk's attorney for various personal and business matters.
[¶3] In 2000, Bullis opened a new law firm in the Amber Valley Parkway area of Fargo. Kevin Christianson was the landlord of the building in which the law firm was located. At that time, Volk was employed as the chief financial officer for Intellisol, Inc., an Australian computer software company which had offices in the same building as the law firm. Intellisol granted Volk an option to purchase 110,000 shares of Intellisol stock for $10 per share, which was less than the market value of the stock. However, Volk did not have the funds available to exercise the option. Volk consulted with Bullis, and Bullis recommended that Volk contact Bruce Hager, a Fargo stockbroker, for suggestions on how to raise the money to exercise the option. Bullis also set up a series of limited liability companies to be used as holding companies to effectuate the transfer of Volk's Intellisol stock.
[¶4] Hager found a group of investors willing to purchase the stock, and in April 2000, Bullis and Volk traveled to Phoenix, Arizona, and met with the Fargo Capital Group to structure the transaction. The Fargo Capital Group was a limited liability company consisting of former Fargo residents living in the Phoenix area. Volk sold the Fargo Capital Group approximately 30,000 of his option shares for $1.2 million. Bullis used his law firm trust account to handle the money for Volk's Intellisol stock transactions. Hager received a 5 percent commission on each sale of stock and Bullis received 5 percent for "legal fees."
[¶5] After the sale, Volk had approximately 80,000 shares of stock remaining, but he also needed funds to pay for his income tax liability incurred in exercising the option. Hager found another investor, James D. Ellefson from Ada, Minnesota, who was interested in purchasing Intellisol stock. Ellefson had approached Hager for financial advice in early 2000, and Hager began managing a substantial amount of his investments. Ellefson chose Hager because Hager advertised as a full service investment advisor with connections to certified public accountants and attorneys. In June 2000, Ellefson purchased approximately 30,000 shares of Intellisol stock for $100,000. Hager had Bullis complete the paperwork for the transaction and the money was paid to Bullis's law firm. Ellefson also completed a prospective investor questionnaire for Bullis disclosing his net worth. According to Bullis, he acted as Volk's attorney for this transaction. The shares were then transferred to Ellefson's revocable living trust. In October 2000, Volk was fired from his position with Intellisol.
[¶6] In December 2000, Hager sold Ellefson life insurance to be held in trust for estate planning purposes and had Bullis handle the legal work for the transaction. Bullis drafted an irrevocable trust agreement for Ellefson. Bullis served as Ellefson's attorney in the transaction and was named trustee of the trust.
[¶7] In spring 2001, Ellefson decided to invest further in Intellisol. Ellefson purchased $500,000 worth of stock warrants, giving him an option to acquire additional shares of Intellisol stock. In exchange for the stock warrants, Ellefson was required to co-make a note with Intellisol at Wells Fargo Bank in Moorhead, Minnesota, for $500,000 with a maturity date of September 1, 2001. Bullis served as Intellisol's attorney in this transaction, but Ellefson testified he believed Bullis was acting as his attorney because "it was represented to me that Bruce Hager and Jim Bullis were representing my best interests."
[¶8] By October 2001, Intellisol was in default with its creditors, including Ellefson, the Fargo Capital Group, and Christianson, Intellisol's landlord. The Fargo Capital Group took over control of Intellisol to protect its investment in the company. The Fargo Capital Group proposed a work-out agreement under which Intellisol could cure its defaults with its larger creditors. Bullis represented Ellefson and Christianson in connection with the proposed work-out agreement. Bullis did not advise Ellefson of his joint representation of Christianson, but Ellefson learned of the joint representation when he was copied on correspondence indicating Christianson was also Bullis's client. In November 2001, Bullis also represented Ellefson in connection with Ellefson's negotiations with Intellisol regarding the terms for renewal of the $500,000 note Ellefson had previously signed as co-maker. Bullis invoiced legal services to both Ellefson and Intellisol for work completed in connection with the work-out agreement and the renewal of the note, but the invoices were submitted to Intellisol for payment.
[¶9] In March 2002, Intellisol ceased operations and was taken over by Workforce ROI, LLC, a company consisting of some members of the Fargo Capital Group. At this time, Ellefson still owed the Wells Fargo Bank $500,000. Ellefson declined an opportunity afforded him as a convertible note-holder to purchase shares in Workforce ROI. After Ellefson declined, Bullis informed Ellefson that Bullis and others were interested in purchasing Ellefson's right to buy shares in Workforce ROI. Bullis told Ellefson he would have a conflict of interest in advising Ellefson concerning the transaction, telling him "I can't represent you. I can't tell you why I can't represent you, but Bruce [Hager] can tell you why I can't represent you. You may want to check with your estate planning counsel if you have any concerns about this." Ellefson did not consult with another attorney, and Ellefson's right to acquire shares was purchased for $100,000 by AV IV, LLC, a limited liability company composed of Hager, Christianson, and GMB Investments, LLC. GMB Investments is a limited liability company composed of Bullis and his law partners, which also owned 50,000 shares of Intellisol stock. Bullis drafted the agreement under which Ellefson's interests were purchased and acted as AV IV's lawyer in the transaction. The agreement allowed for the possibility of Ellefson recouping $483,259.67, but only if AV IV first recouped its original investments and prior Intellisol losses in the amount of $1,046,837.54.
[¶10] During the time he represented Ellefson, Bullis did not advise him of his relationship with Volk, Hager, and Intellisol; the various legal entities Bullis had created for Volk to effectuate the transfer of Intellisol stock; the arrangement in which Bullis and Hager each received 5 percent for each sale of stock; and Bullis and his law partners' ownership of 50,000 shares of Intellisol stock. Ellefson filed a complaint with the Disciplinary Board upon learning of Bullis's various relationships through a newspaper article.
[¶11] Following a hearing, the hearing panel found that Bullis violated N.D.R. Prof. Conduct 1.7(a), (b), and (c) because his loyalties were impaired by conflicting responsibilities as the lawyer for Volk, Intellisol, Ellefson, Christianson, and AV IV; as the business associate of Volk, Hager and Christianson; as trustee of the Ellefson irrevocable trust; and as an owner of Intellisol stock. The panel also found that Bullis violated N.D.R. Prof. Conduct 1.8(a) and (b) because Bullis used his knowledge of Ellefson's investment strategies to his advantage and failed to advise Ellefson to seek independent counsel. The panel recommended:
1. Reprimand under Standard 4.33, N.D. Stds[.] Imposing Lawyer Sanctions;
2. A requirement that, in addition to the mandatory continuing legal education (CLE) requirements of Rule 3, N.D.R. Continuing Legal Ed., Bullis complete six hours of CLE in the area of conflicts of interest and how to avoid them within the next 24 months, these six hours shall be active CLE courses and not self study;
3. An assessment of costs and expenses of the disciplinary proceeding in the amount of $5,181.15.

II
[¶12] In In re Chinquist, 2006 ND 107, ¶ 7, 714 N.W.2d 469 (citations omitted), we set forth our standard of review for disciplinary proceedings:
We review disciplinary proceedings de novo on the record. We accord due weight to the findings, conclusions, and recommendations of the hearing panel, but we do not act as a mere rubber stamp. Disciplinary counsel bears the burden of proving each alleged violation of the disciplinary rules by clear and convincing evidence. Each disciplinary case must be considered upon its own facts to decide what discipline, if any, is warranted.
Because the hearing panel had the opportunity to hear the witnesses and observe their demeanor, we accord special deference to its findings on matters of conflicting evidence. In re Crary, 2002 ND 9, ¶ 7, 638 N.W.2d 23.

A
[¶13] The hearing panel found that Bullis violated N.D.R. Prof. Conduct 1.7(a), (b), and (c),[1] which provide:
(a) A lawyer shall not represent a client if the lawyer's ability to consider, recommend, or carry out a course of action on behalf of the client will be adversely affected by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests.
(b) A lawyer shall not represent a client when the lawyer's own interests are likely to adversely affect the representation.
(c) A lawyer shall not represent a client if the representation of that client might be adversely affected by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
Conflicts of interest affect a lawyer's loyalty, which "is an essential element in the lawyer's relationship to a client." Comment, N.D.R. Prof. Conduct 1.7; see also Continental Res., Inc. v. Schmalenberger, 2003 ND 26, ¶ 12, 656 N.W.2d 730. When a lawyer has conflicting responsibilities as the lawyer for various clients, those loyalties owed to the client are impaired. See In re Christensen, 2005 ND 87, ¶ 14, 696 N.W.2d 495. "The mere possibility of adverse effect upon exercise of free judgment prevents a lawyer from representing clients with opposing interests." In re Gerde, 634 N.E.2d 494, 497 (Ind. 1994). Although the conflict situation described in subsection (c) of the rule may be waived by the client, if a conflict situation described in subsections (a) and (b) arises, "the lawyer is absolutely prohibited from undertaking or continuing representation of the client." Comment, N.D.R. Prof. Conduct 1.7.
[¶14] We agree with the hearing panel that Bullis's ability to consider, recommend, and carry out a course of action on behalf of Ellefson was adversely affected by Bullis's responsibilities to other clients, including Volk, Intellisol, Christianson, and AV IV; to third party business associates, including Volk, Hager, and Christianson; and by Bullis's own interests. Although Bullis contends he had no attorney-client relationship with Ellefson until late 2001 when he represented Ellefson and Christianson in connection with the work-out agreement, Bullis created the irrevocable living trust for Ellefson in December 2000 and served as the trustee throughout these various transactions after creation of the trust. While Bullis characterizes creation of the trust as a "minor transaction," Ellefson afterward believed Bullis was representing him in spring 2001 when he was co-maker of a note in exchange for the Intellisol stock warrants, even though Bullis was actually representing Intellisol. Ellefson's belief is understandable considering Bullis's creation of the trust only a few months earlier and his continuing service as the trustee. The attorney-client relationship continues as long as the influence arising from the attorney-client relationship continues. See In re Giese, 2003 ND 82, ¶ 17, 662 N.W.2d 250.
[¶15] We also reject Bullis's argument that his multiple representations did not run afoul of N.D.R. Prof. Conduct 1.7 because "[a]ll of the interests of his clients were the same." Bullis's law firm owned 50,000 shares of Intellisol stock and Bullis received a 5 percent "legal fee" on each sale of Intellisol stock. Bullis had longstanding personal relationships with Volk, Intellisol, and Hager, and provided legal representation to Volk and Intellisol. Bullis initially represented Volk when Ellefson purchased $100,000 worth of Intellisol stock, and his representation of Volk was not disclosed to Ellefson. Bullis proceeded to create the irrevocable living trust for Ellefson and served as its trustee. Bullis then represented Intellisol when Ellefson purchased $500,000 worth of Intellisol stock warrants, before again representing Ellefson concerning the work-out agreement and the negotiations with Intellisol for renewal of the $500,000 note. Unbeknownst to Ellefson, Bullis also represented Christianson in connection with the work-out agreement, and Christianson would ultimately become part of AV IV, the company that purchased Ellefson's right to buy shares in Workforce ROI. Bullis acted as AV IV's attorney in this final transaction and also had an interest in AV IV.
[¶16] Ellefson's interests as an investor in and creditor of Intellisol were directly adverse to the interests of Volk and Intellisol. Intellisol's interests were adverse to Christianson's interests as a creditor of Intellisol. Ellefson's interests were also adverse to Christianson's interests, at least by the time AV IV purchased Ellefson's rights, and Ellefson's interests were adverse to AV IV's interests. Bullis's interests as an Intellisol stockholder and recipient of "legal fees" upon each sale of stock were also adverse to Ellefson's interests. Yet, Bullis never sought consent for his multiple representations. Indeed, during a relatively short time span, Bullis switched back and forth representing Volk, Intellisol, Ellefson, Christianson, and AV IV. This Court has condemned the practice of "side-switching" because of the appearance of impropriety which will create the client's suspicion that the attorney has breached the duty of fidelity and loyalty to the client. See Continental Res., Inc., 2003 ND 26, ¶ 24, 656 N.W.2d 730; Heringer v. Haskell, 536 N.W.2d 362, 366-67 (N.D. 1995). The impropriety is worse when the client is apparently unaware that his attorney has switched sides. An attorney representing multiple clients cannot by subjective or secret analysis eliminate one as a current client and decide that he is only representing another current client on a particular transaction. See In re Vaile, 707 P.2d 52, 55 (Or. 1985).
[¶17] We conclude there is clear and convincing evidence that Bullis violated N.D.R. Prof. Conduct 1.7(a), (b), and (c).

B
[¶18] The panel also found Bullis violated N.D.R. Prof. Conduct 1.8(a) and (b), which provide:
(a) Except for standard commercial transactions involving products or services that the client generally markets to others, a lawyer shall not enter into a business, financial or property transaction with a client unless:
(1) The transaction is fair and reasonable to the client; and
(2) After consultation, including advice to seek independent counsel, the client consents to the transaction.
(b) Except as permitted or required in N.D.R. Prof. Conduct 1.6 and 3.3, a lawyer shall not use information relating to representation of a client to the disadvantage of the client for purposes of furthering either the lawyer's or another person's interest unless after consultation, including advice to seek independent counsel, the client consents.
The hearing panel reasoned this rule was violated because Bullis used his knowledge of Ellefson's investment strategies to his advantage and failed to advise Ellefson to seek independent counsel. Bullis argues the rule was not violated because the transaction in which AV IV purchased Ellefson's right to buy shares was fair and reasonable to Ellefson; because he advised Ellefson to contact his estate counsel about the transaction; and because he did not use any information gained during the representation to Ellefson's disadvantage.
[¶19] "Business transactions between an attorney and client are fraught with pitfalls and traps, and an attorney, with his superior knowledge and education, engages in business transactions with a client at the attorney's peril and is held to the highest standards" Giese, 2003 ND 82, ¶ 22, 662 N.W.2d 250. Bullis was well aware of Ellefson's financial situation through the prospective investor questionnaire and his representations of him. Bullis did not disclose to Ellefson that he had a longstanding business relationship with Volk, Hager, and Intellisol; that his law firm owned Intellisol stock; and that he was receiving a 5 percent fee from each sale of Intellisol stock. After the initial sale of stock to Ellefson and after Bullis created the trust for Ellefson, Bullis represented Intellisol in securing an additional $500,000 commitment from Ellefson in the form of stock warrants. After having again represented Ellefson in connection with renewal of the $500,000 note, Bullis represented AV IV, a company in which he had a stake, in purchasing Ellefson's right to invest in Workforce ROI.
[¶20] We have said the prohibition against transactions with a client continues as long as the influence arising from the attorney-client relationship continues. Giese, 2003 ND 82, ¶ 17, 662 N.W.2d 250. Ellefson testified that he has lost approximately $491,000 through these transactions, and denied that Bullis told him to secure independent legal advice. Although Bullis testified he informed Ellefson that he could not represent him because of a conflict of interest, Bullis did not explain what the conflict was and proceeded to acquire Ellefson's interests as the lawyer for AV IV. An attorney must take precautions to ensure a client is fully aware of the details and risks of such a transaction, "and a passing suggestion to consult a second attorney does not discharge an attorney's obligation." Id. at ¶ 22. We agree with the hearing panel that these circumstances establish Bullis used his knowledge of Ellefson's investment strategies to his advantage and failed to adequately advise Ellefson to seek independent counsel.
[¶21] We conclude there is clear and convincing evidence that Bullis violated N.D.R. Prof. Conduct 1.8(a) and (b).

III
[¶22] The hearing panel recommended that Bullis be reprimanded, complete six additional hours of non-self-study continuing legal education on conflicts of interest within the next two years, and pay $5,181.15 for the costs and expenses of the disciplinary proceeding. Disciplinary counsel argues that a reprimand is inappropriate under the circumstances, and Bullis should be suspended for 90 days in addition to the other sanctions recommended by the panel.
[¶23] Under N.D. Stds. Imposing Lawyer Sanctions 2.1, 2.2, and 2.4, potential sanctions include disbarment, suspension, and reprimand. See Chinquist, 2006 ND 107, ¶ 21, 714 N.W.2d 469. In determining a proper sanction, N.D. Stds. Imposing Lawyer Sanctions 3.0 directs that this Court consider "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." Sanctions for failure to avoid conflicts of interest are explained in N.D. Stds. Imposing Lawyer Sanctions 4.3, which provides in relevant part:
Absent aggravating or mitigating circumstances, upon application of the factors set out in N.D. Stds. Imposing Lawyer Sanctions 3.0, the following sanctions are generally appropriate in cases involving conflicts of interest:
. . . .
4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.
4.33 Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client. The issuance of an admonition should be limited to cases of negligence which cause no serious injury or little or no injury to a client. A reprimand is not a sufficiently harsh sanction in an instance where the lawyer's negligence causes substantial injury to a client.
The hearing panel decided a reprimand was appropriate because "Bullis exercised poor judgment and was negligent in determining there was a conflict and caused injury or potential injury to the client."
[¶24] "Knowledge" and "Negligence" are defined in the definitions section of the North Dakota Standards for Imposing Lawyer Sanctions:
"Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.
"Negligence" is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.
[¶25] We reject the hearing panel's finding that Bullis's conduct was the product of mere "negligen[ce]" and "poor judgment." "A knowing or willful act for purposes of a professional disciplinary proceeding does not require evil intent or bad purpose; rather, the terms mean the act was done in the exercise of the performer's free will and was not done under coercion." In re LaQua, 548 N.W.2d 372, 376 (N.D. 1996). Bullis demonstrated knowledge of a conflict of interest when he testified that he told Ellefson he could not represent him during the transaction in which AV IV purchased Ellefson's right to buy Intellisol stock. Bullis would not explain the nature of the conflict and proceeded to act as the attorney for AV IV in completing the purchase. Because Bullis acted with knowledge, we believe a suspension from the practice of law is the appropriate sanction.
[¶26] The North Dakota Standards for Imposing Lawyer Sanctions are designed to promote "consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions." N.D. Stds. Imposing Lawyer Sanctions 1.3. Sanctions imposed for conflict of interest violations in North Dakota have ranged from reprimand to disbarment, depending on the egregiousness of the conduct, the existence of other ethical violations, and the presence of mitigating or aggravating factors. See, e.g., In re Christensen, 2005 ND 87, ¶¶ 17-19, 696 N.W.2d 495 (reprimanded and required to successfully complete Multistate Professional Responsibility Examination based on consent to discipline); Giese, 2003 ND 82, ¶ 28, 662 N.W.2d 250 (suspended for 90 days and ordered to pay restitution); Crary, 2002 ND 9, ¶ 27, 638 N.W.2d 23 (disbarred and ordered to pay restitution). Cases from other jurisdictions demonstrate a similar divergence in sanctions imposed. See, e.g., Gerde, 634 N.E.2d 494, 497 (Ind. 1994) (reprimanded); Iowa Supreme Court Disciplinary Bd. v. Howe, 706 N.W.2d 360, 382 (Iowa 2005) (indefinitely suspended with no possibility of reinstatement for four months); In re Dato, 614 A.2d 1344, 1355 (N.J. 1992) (suspended for one year); In re Gelbwaks, 696 N.Y.S.2d 45, 51 (N.Y. App. Div. 1999) (disbarred); State ex rel. Oklahoma Bar Ass'n v. McGee, 48 P.3d 787, 794 (Okla. 2002) (suspended for four months); Vaile, 707 P.2d 52, 59-60 (Or. 1985) (suspended for 60 days and placed on probation); Committee on Legal Ethics v. Frame, 433 S.E.2d 579, 584 (W. Va. 1993) (reprimanded).
[¶27] Under N.D. Stds. Imposing Lawyer Sanctions 9.22, the hearing panel found as aggravating factors that Bullis committed multiple offenses, refused to acknowledge the wrongful nature of his conduct, and had substantial experience in the practice of law. Under N.D. Stds. Imposing Lawyer Sanctions 9.32, the panel found as mitigating factors Bullis's lack of a prior disciplinary record, his full and free disclosure to the disciplinary board and cooperative attitude toward the proceedings, and his character and reputation.
[¶28] Bullis's conduct was pervasive and demonstrates an indifference to basic conflict of interest considerations. There has been at least potential injury, if not actual injury, to Ellefson. Having taken into consideration all of the circumstances surrounding Bullis's misconduct, including aggravating and mitigating circumstances and sanctions imposed under similar circumstances, we order that Bullis be suspended from the practice of law for 90 days commencing January 1, 2007. Bullis must complete six hours of non-self-study CLE courses on conflicts of interest within the next two years in addition to the normal CLE requirements under N.D.R. Continuing Legal Ed. 3. We further order that Bullis pay the costs and expenses of the disciplinary proceeding in the amount of $5,181.15.
[¶29] Gerald W. VandeWalle, C.J.
Carol Ronning Kapsner
Mary Muehlen Maring
William F. Hodny, S.J.
Benny A. Graff, S.J.
[¶30] The Honorable William F. Hodny, S.J., and the Honorable Benny A. Graff, S.J., sitting in place of Sandstrom, J. and Crothers, J., disqualified.
NOTES
[1] We apply the North Dakota Rules of Professional Conduct as they existed when the hearing was held and the panel issued its recommendations, which occurred before the most recent amendments to the rules became effective on August 1, 2006. See In re Landon, 1999 ND 202, ¶ 19, 600 N.W.2d 856.