2015 ND 111

In the Matter of the Application for Disciplinary Action Against Kerry J. CARPENTER, a Member of the Bar of the State of North Dakota.

Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner

v.

Kerry J. Carpenter, Respondent.

No. 20140254.

Supreme Court of North Dakota.

May 1, 2015.

Brent J. Edison, Bismarck, N.D., for petitioner.

Sean O. Smith, Bismarck, N.D., for respondent.

## SUSPENSION ORDERED

PER CURIAM.

[¶ 1] Attorney Kerry J. Carpenter objects to the findings, conclusions, and recommendation of the Disciplinary Board that he be suspended from the practice of law for 90 days and be assessed the costs of the proceedings for violating N.D.R. Prof. Conduct 1.18, which addresses duties owed to potential clients, and N.D.R. Prof. Conduct 1.7, which addresses conflicts of interest. We conclude there is clear and convincing evidence Carpenter violated N.D.R. Prof. Conduct 1.18. We suspend Carpenter from the practice of law for 90 days commencing July 1, 2015, order that he complete six hours of Continuing Legal Education on conflicts of interest in addition to the mandatory requirements, and order that he pay $7,107.79 for the costs and expenses of the disciplinary proceedings.

## I

[¶ 2] Carpenter was admitted to practice law in North Dakota on October 5, 1981. From 1981 until 1987, Carpenter worked as an oil and gas landman in North Dakota. During this period, Carpenter became a business acquaintance with another landman, Martin Thompson. After 1987, Carpenter began practicing law and also eventually became a real estate broker in Bismarck. In the late 1990s, the Christian Science Church listed property it owned in Bismarck with Carpenter and Carpenter assisted the Church in having the property re-zoned to facilitate its sale. Through the years, Thompson and his mother also listed their Bismarck homes for sale with Carpenter. In 2008, Thompson approached Carpenter about a potential opportunity to obtain mineral interests in McLean County. Although they agreed to a "50/50" partnership arrangement in the matter, the deal never came to fruition.

[¶ 3] In early 2009, Thompson learned that a deceased person had owned a large number of mineral acres in Mountrail County, and Thompson spent more than 300 hours researching the deceased's potential heirs so he could either negotiate a finder's fee, or lease or purchase the mineral acres. Thompson later obtained from an individual a copy of the deceased's will, which bequeathed the mineral acres to the headquarters of the Christian Science Church in Boston, Massachusetts. Thompson and a partner contacted a Williston attorney to assist them in negotiating with the Church. The attorney sent letters to the Church proposing several alternative deals, and accompanied the letters with copies of the will, other documents, and eventually, a notice of lapse of mineral interests under N.D.C.C. § 38–18.1 filed by the surface owners and first published on January 13, 2010. The attorney was unsuccessful in his negotiations with the Church, and on March 1, 2010, the Church advised the attorney that it was not interested in pursuing the matter.

[¶ 4]   The Board found that on March 1, 2010, Thompson telephoned Carpenter about the Mountrail County mineral acres. On March 2, 2010, Thompson provided Carpenter with detailed information about the deceased's will, the Williston attorney's efforts to negotiate with the Church, and the potential that a portion of the mineral acreage could be lost because a notice of lapse had been filed. On March 3, 2010, Thompson and Carpenter met and Carpenter reviewed documents from Thompson's research file. Thompson provided Carpenter with copies of the deceased's will, the Williston attorney's first letter to the Church, a portion of an oil and gas lease involving the mineral interests, and the notice of lapse.

[¶ 5]   On March 5, 2010, Carpenter sent a letter to Thompson "to confirm the nature of our meeting on March 3, 2010":

I explained again that I could not represent you because I felt it would be a conflict with my past representation of the Church. I did offer to contact the Church to see if the Church wanted me to handle the matter for them with the plan that I would ask if the Church would be willing to compensate you for the work you had done. I asked you for the telephone number to do so and you said you would go home to get it and call me back. As you left, we agreed that, while I was waiting for you to get the number, I would call my local Church contact to inquire if he would be willing to help in contacting the Church in Boston for this purpose. My contact said he would be willing to make a call. When I called you back to ask if you had the number yet, you informed me that one of your silent partners was dissatisfied that you may not receive enough compensation from the Church for your (joint) efforts, so you directed me to "hold off" until the next day. You called me on March 4, 2010, and told me the

partner was still dissatisfied and that you wanted me to drop the matter. I expressed my concern in that I had already made contact with the Church in accordance with our conversation of the previous day.

This letter is to confirm what I told you both before and at the beginning of our meeting that I do not represent you in this matter. I also want to inform you that, in the event of further contact from Church representatives about this, I will divulge only public or published information to the Church. I received no confidential information from you at the time of our meeting that was not already communicated to the Church by [the Williston attorney] on your behalf, including a copy of the discovered Will.

[¶ 6]   On March 11, 2010, Thompson sent a letter to Carpenter, stating:

While the events of our meeting are still very clear in my mind, I would like to clarify certain parts of that meeting as relates to statements you have made in your letter.

In our initial conversation over the telephone, I gave you some background information on my attempts to find [the deceased's] heirs and the probable value of the minerals in his estate. I also faxed you a copy of [the Williston attorney's] letter to the Christian Science Church. We also decided to have a meeting so we could discuss this matter specifically as to a partnership arrangement between you and me in trying to possibly buy the minerals from the church. At the meeting you said you had already contacted a person associated with the local Christian Science Church and said that person could be of assistance in contacting the mother church in Boston, Massachusetts, if need be.

At our meeting I provided you with copies of [the deceased's] will, death certificate, dormant mineral filing, the trustee's oil and gas information, etc. I explained that there could be about $1.5 million in mineral value. You stated that your contingency fee was 40% of any property involved but that ethically you could not split any fees you would be able to collect via the contingency fee. You then indicated that you could propose a 10% fee for me to the church since I had spent quite a few hours in researching [the deceased's] lineage. You would then settle for a 30% contingency fee.

I never knew before our meeting that you would not be representing me and it was my impression that at the least we were going to explore to somehow be partners in negotiating a deal with the church as to the [the deceased's] minerals. Otherwise there would have been no sense in having a meeting.

I do not recall you ever telling me, either before the meeting or at the beginning of the meeting, that you could not represent me in this matter. Quite to the contrary, I recall that at the end of the meeting I made a statement to you that you were representing me at that point and you replied that you were not representing me. You also stated that you could possibly have a conflict of interest in this matter since you had done some legal work for the church in the past and that you may be ethically obligated to them to provide them the information I had given to you. You then stated that you may have to do some research on that particular point.

At the disciplinary hearing, Carpenter and Thompson testified in accordance with their statements in the letters. The Board found that Thompson's version of the events on March 3, 2010, was "more credible" than Carpenter's version.

[¶ 7] After the meeting on March 3, 2010, Carpenter called the Church's local representative and on March 9, 2010, Carpenter participated in a conference call with the local representative and the estate and trust officer for the Church. Carpenter agreed to represent the Church in filing documents in Mountrail County to prevent the lapse of a portion of the deceased's mineral acres, and he did so. Carpenter also proposed to provide the estate and trust officer with his "agreement forms" if she was willing to take any further steps regarding the mineral acres. Carpenter eventually represented the Church in pursuing its claim to the bequeathed mineral acres. On December 10, 2010, Carpenter sent a letter to the estate and trust officer to "confirm the terms of Carpenter's representation of The Church to locate and recover mineral properties . . . to which The Church has a legal claim to an ownership interest":

My fee for these services (including clearing of record title into the client's name) and for all services previously provided on behalf of The Church in connection with the preparation and filing of that certain Affidavit Of Claim to Mineral Interest With Supporting Documentation filed with the County Recorder, Mountrail County, North Dakota, on March 15, 2010, shall be calculated as follows:

1. 12% (Twelve percent) of the gross value of all property and/or monetary proceeds therefrom, which are recovered to the name of The Church for its ownership and benefit, to be paid in kind according to the nature of the property actually recovered. For example, the fee for monetary proceeds recovered shall be paid in cash or

equivalent thereof, equal to 12% of the amount recovered; and mineral properties recovered to the name of The Church shall be paid by recordable conveyance of a 12% interest thereof; and

2. It is understood that any payment to Carpenter for such services and all costs related thereto is *entirely contingent* upon Carpenter making recovery for The Church or on The Church's behalf. If there is no recovery, Carpenter shall receive no fees or cost reimbursement of any kind or nature. In mineral deeds recorded in 2011, the Church granted Carpenter and his spouse 12 percent of the Church's mineral interests in the property.

[¶ 8] The Board determined Carpenter violated N.D.R. Prof. Conduct 1.18 and 1.7:

24. As a result of the telephone communications in early March 2010, and the meeting in Carpenter's office on March 3, 2010, Thompson was a "potential client" of Carpenter. *See,* Rule 1.18(a), N.D.R. Prof. Conduct.

25. On March 3, 2010, Thompson provided Carpenter with "significantly harmful information." *See,* Rule 1.18(b), N.D.R. Prof. Conduct.

26. After the meeting on March 3, 2010, Carpenter revealed the information learned from Thompson to the Church for Carpenter's own benefit and that of the Church. *See,* Rule 1.18(b), N.D.R. Prof. Conduct.

27. After the meeting on March 3, 2010, Carpenter represented a client, the Church, whose interests were materially adverse to a potential client, Thompson, in the same or a substantially related matter (i.e., pursuit of [the deceased's] mineral acreage). *See,* Rule 1.18(c), N.D.R. Prof. Conduct.

28. Carpenter failed to take steps to limit Thompson's disclosure of more significantly harmful information than was reasonably necessary for Carpenter to determine whether to represent Thompson. *See,* Rule 1.18(d), N.D.R. Prof. Conduct. (TR 236)

29. Thompson did not consent to Carpenter's representation of the Church. (TR 75, 233–234)

30. Carpenter's loyalties were impaired by the conflicting interests of Thompson, the Church and Carpenter himself.

The Board recommended that Carpenter be suspended from the practice of law for 90 days, that he be required to complete six additional hours of Continuing Legal Education in the area of conflicts of interest, and that he pay costs and expenses of the proceedings in the amount of $7,107.79.

II

[¶ 9] Carpenter objects to numerous findings and conclusions of the Board.

This Court reviews disciplinary proceedings de novo on the record. *Disciplinary Board v. Light,* 2009 ND 83, ¶ 6, 765 N.W.2d 536 (citations omitted). Disciplinary counsel must prove each alleged violation by clear and convincing evidence, which means the trier of fact must be reasonably satisfied with the facts the evidence tends to prove and thus be led to a firm belief or conviction. *Id.* The evidence need not be undisputed to be clear and convincing. *Id.* We give due weight to the findings, conclusions, and recommendations of the Disciplinary Board, but we do not act as a mere rubber stamp for the Board. *Id.* To decide which sanction, if any, is appropriate, each disciplinary matter must be considered on its own facts. *Id.*

Because the hearing panel has the opportunity to hear witnesses and observe their demeanor, we accord special deference to the panel's findings on matters of conflicting evidence. *Disciplinary Board v. Bullis*, 2006 ND 228, ¶ 12, 723 N.W.2d 667. Similarly, we defer to the hearing panel's findings on the credibility of a witness, because the hearing panel has the opportunity to observe the witness's demeanor and hear the witness testify. *Disciplinary Board v. Johnson*, 2007 ND 203, ¶ 22, 743 N.W.2d 117. *Disciplinary Board v. Askew*, 2010 ND 7, ¶¶ 8–9, 776 N.W.2d 816.

## A

[¶ 10] Duties to a potential client are outlined in N.D.R. Prof. Conduct 1.18, which provides:

(a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a potential client.

(b) Even when no lawyer-client relationship ensues, a lawyer who has had discussions with a potential client shall not use or reveal significantly harmful information learned in that consultation, except as Rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a potential client in the same or a substantially related matter if the lawyer received information from the potential client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

(d) When the lawyer has received significantly harmful information, representation is permissible if:

(1) both the affected client and the potential client have given consent; or

(2) the lawyer who received the information took reasonable measures to avoid exposure to more significantly harmful information than was reasonably necessary to determine whether to represent the potential client and notice is promptly given to the potential client.

■ [¶ 11] Carpenter argues the Board's finding that Thompson approached him about either representing Thompson or becoming Thompson's partner is not supported by clear and convincing evidence. However, Thompson testified that before the March 3, 2010, meeting, he contacted Carpenter "and asked him if he wanted to explore either partnering up or representing me in contacting—the beneficiary of the will." Thompson's recollections in his letter that this was the only purpose of the meeting and Carpenter had to do some research to determine whether a conflict of interest existed further supports the Board's finding. We conclude this finding is supported by clear and convincing evidence.

[¶ 12] Carpenter argues three of the Board's findings relating to the 2008 partnership arrangement for the McLean County mineral interests were not relevant to this proceeding. Relevant evidence is evidence having "any tendency to make a fact more or less probable than it would be without the evidence." N.D.R.Ev. 401(a). Because Thompson had previously entered into a partnership arrangement to acquire mineral interests in McLean County made it more probable that Thompson again approached Carpenter in 2010 to either partner with him or have Carpenter represent him with regard to the Mountrail County

mineral interests, the evidence was relevant to the proceeding.

[¶ 13] Carpenter argues the Board erred in failing to determine whether the March 3, 2010, meeting occurred in the morning, as he testified, or in the afternoon, as Thompson testified. According to Carpenter, this finding was crucial in determining whether Thompson was a potential client because if documents were faxed to Carpenter after the meeting, Thompson could not have been a potential client. The Board did not decide the time of the meeting because "it is undisputed that during the meeting Carpenter reviewed documents from Thompson's research file." Although the Board did not specifically find when the meeting occurred, it did find "more credible. Thompson's version of the events that took place on March 3, 2010," meaning it accepted Thompson's testimony that the meeting occurred in the afternoon. We conclude the Board's finding that Thompson was a "potential client" for purposes of N.D.R. Prof. Conduct 1.18(a) is supported by clear and convincing evidence.

■ [¶ 14] Carpenter argues there is not clear and convincing evidence to support the Board's finding that Thompson provided Carpenter with "significantly harmful information" for purposes of N.D.R. Prof. Conduct 1.18(b). The Board did not specify what information was "significantly harmful."

, [¶ 15] The term "significantly harmful information" is not defined in N.D.R. Prof. Conduct 1.18. The ABA/BNA Lawyer's Manual on Professional Conduct, at 31:157 (2011), explains:

Rule 1.18 does not define the types of "significantly harmful" information that trigger the disqualification standard in subsection (c), nor is that term included among the definitions in Model Rule 1.0 (Terminology).

In Wisconsin Formal Ethics Op. EF–10–03, 27 Law. Man. Prof. Conduct 41 (2010), the state bar's ethics committee surveyed other authorities in drawing up its own summary of what the phrase means:

Information may be "significantly harmful" if it is sensitive or privileged information that the lawyer would not have received in the ordinary course of due diligence; or if it is information that has long-term significance or continuing relevance to the matter, such as motives, litigation strategies, or potential weaknesses. "Significantly harmful" may also be the premature possession of information that could have a substantial impact on settlement proposals and trial strategy; the personal thoughts and impressions about the facts of the case; or information that is extensive, critical, or of significant use.

See also *Sturdivant v. Sturdivant* [367 Ark. 514], 241 S.W.3d 740, 22 Law. Man. Prof. Conduct 528 (2006) (meeting with prospective client about child custody matter gave lawyer information that potentially was "significantly harmful" and thus warranted disqualification of lawyer and his firm from representing adverse party in same matter).

Courts, in the context of disqualification motions, have said "in order for information to be deemed 'significantly harmful' within the context of [the equivalent of N.D.R. Prof. Conduct 1.18], disclosure of that information cannot be simply detrimental in general to the former prospective client, but the harm suffered must be prejudicial in fact to the former prospective client within the confines of the specific matter in which disqualification is sought, a determination that is exquisitely fact-sensitive and -specific." *O Builders & Assocs., Inc. v. Yuna Corp.*, 206 N.J. 109,

19 A.3d 966, 976 (2011); *see also State ex rel. Thompson v. Dueker*, 346 S.W.3d 390, 396 (Mo.Ct.App.2011) (same). Furthermore, N.D.R. Prof. Conduct 1.18(b) incorporates a lawyer's duties to a former client, and N.D.R. Prof. Conduct 1.9(c)(1) prohibits a lawyer from using "information relating to the representation to the disadvantage of the former client . . . ."

[¶ 16] The record reflects that the information provided to Carpenter had already been divulged to the Church through Thompson's efforts with the Williston attorney. We recognize that most of the information was contained in public records, and generally "records that are already public . . . are not confidential and thus would not pose any significant harm." *Zalewski v. Shelroc Homes, LLC*, 856 F.Supp.2d 426, 435 (N.D.N.Y.2012). But it is quite another matter when a person devotes more than 300 hours searching public records for pieces of a puzzle in an attempt to locate a deceased's heirs. The information collected by Thompson was valuable to Thompson, and was sensitive information Carpenter would not have received in the ordinary course of due diligence. Thompson divulged this information of a potential claim to Carpenter, who had previous dealings with the Church, and Carpenter took advantage of this information. Carpenter took over Thompson's efforts to negotiate with the Church, and as a result, Thompson suffered harm from Carpenter's actions. But for Thompson giving the information to Carpenter, Carpenter would not have had the opportunity to represent the Church in obtaining the Mountrail County mineral interests and receiving a portion of those interests. While Carpenter may not have "reveal[ed]" significantly harmful information to the Church, Carpenter "use[d]" the information for his own personal benefit to the detriment of Thompson. Although the Board did not specify what information

was "significantly harmful," it is apparent from our de novo review of the record the Board's finding that Thompson provided Carpenter with "significantly harmful information" is supported by clear and convincing evidence.

[¶ 17] Carpenter argues the Board erred in finding that the interests of Thompson and the Church were "materially adverse" for purposes of N.D.R. Prof. Conduct 1.18(c). Thompson approached Carpenter to have Carpenter either represent him or partner with him to receive compensation from the Church for his efforts in locating the deceased's heirs. The Church and Thompson were adverse parties regarding the issue of compensation for Thompson's services. Any actions taken by Carpenter on behalf of the Church or on behalf of his own interests, to the exclusion of Thompson, were materially adverse to Thompson's interests. The Board's finding is supported by clear and convincing evidence.

[¶ 18] Carpenter also argues the Board's finding that he "continued to pursue the matter" after filing statement of claim forms for the Church is not supported by clear and convincing evidence. But this is a permissible inference arising from his subsequent actions on behalf of the Church and his fee arrangement with the Church. The Board's finding is supported by clear and convincing evidence.

[¶ 19] We conclude there is clear and convincing evidence Carpenter violated N.D.R. Prof. Conduct 1.18.

**B**

[¶ 20] The Board also found Carpenter violated N.D.R. Prof. Conduct 1.7, which addresses conflicts of interest, but the Board made no findings of conduct specifically relating to this rule. Unnecessary "stacking" or "piling on" of rule violations

for the same conduct is discouraged. *See, e.g., Judicial Conduct Comm'n v. Corwin*, 2014 ND 50, ¶ 26, 843 N.W.2d 830. We do not consider this issue because, even if Carpenter's conduct violated the rule, the sanction would not be affected.

### III

[¶ 21] In considering the appropriate sanction for a lawyer's misconduct, we consider: "(1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors." *Disciplinary Action Against Dvorak*, 2000 ND 98, ¶ 17, 611 N.W.2d 147; N.D. Stds. Imposing Lawyer Sanctions 3.0. Carpenter violated duties owed to a potential client by knowingly using the information provided to him for his personal benefit, resulting in actual harm to the potential client through loss of any compensation for Thompson's many hours spent searching for heirs of the deceased. The mineral rights were valued at up to $3 million. As aggravating factors under N.D. Stds. Imposing Lawyer Sanctions 9.22, the Board considered a selfish motive, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. As mitigating factors under N.D. Stds. Imposing Lawyer Sanctions 9.32, the Board considered the absence of a prior disciplinary record and full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings.

[¶ 22] In cases involving conflicts of interest, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." N.D. Stds. Imposing Lawyer Sanctions 4.32. Considering these factors, we adopt the Board's recommendations. We suspend Carpenter from the practice of law for 90 days commencing July 1, 2015, order that he complete six hours of Continuing Legal Education on conflicts of interest in addition to the mandatory requirements, and order that he pay $7,107.79 for the costs and expenses of the disciplinary proceedings. Carpenter must comply with N.D.R. Lawyer Discipl. 6.3, and his reinstatement is governed by N.D.R. Lawyer Discipl. 4.5(B).

[¶ 23] GERALD W. VANDE WALLE, C.J., WILLIAM F. HODNY, S.J., CAROL RONNING KAPSNER, LISA FAIR McEVERS and DANIEL J. CROTHERS, JJ., concur.

[¶ 24] The Honorable WILLIAM F. HODNY, S.J., sitting in place of SANDSTROM, J., disqualified.